UNITES STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAILY NEWS, CHARITIES, INC.<br><br>        Plaintiff,<br><br>   -against-<br><br>USA BOXING METROPOLITAN ASSOCIATION,<br><br>        Defendant. | No. 17-cv-08733(VEC) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

 

Satterlee Stephens LLP
230 Park Avenue
New York, New York 10169
(212) 818-9200
*Attorneys for Plaintiff*

2881912_8

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................2

    I.    PLAINTIFF HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS ...................................................................................................................2

        A.    Metro Has No Basis for Asserting Continuous Use of the Mark GOLDEN GLOVES And Even As Alleged Its Use Would Have Been Licensed Use That Does Not Trump DNC's Common-Law Rights ..................................2

        B.    The Phrase GOLDEN GLOVES Is Not Descriptive ..................................3

        C.    Use of GOLDEN GLOVES as a Brand Is Not "Fair Use" ..........................4

        D.    Metro's Infringing Use of a Depiction of Golden Boxing Gloves Should Not Be Permitted ..................................................................................5

        E.    Metro's Use of the Phrase "Gloves" In Connection with an Amateur Boxing Tournament in the NYC Metropolitan Area Is Infringing and Should Be Enjoined Consistent with the Relief Already in Place under the TRO ...................................................................................................6

    II.    PLAINTIFF HAS DEMONSTRATED IRREPARABLE HARM ..........................7

    III.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FACTORS TIP IN PLAINTIFF'S FAVOR ..........................................................7

    IV.    THE SCOPE OF THE INJUNCTIVE RELIEF SOUGHT BY DNC IS PROPER ...................................................................................................9

CONCLUSION .................................................................................................................10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Beastie Boys v. Monster Energy Co.*,
  87 F. Supp. 3d 672 (S.D.N.Y. 2015) ................................................................................9

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
  973 F.2d 1033 (2d Cir. 1992) ...........................................................................................3

*CJ Prod. LLC v. Snuggly Plushez LLC*,
  809 F. Supp. 2d 127 (E.D.N.Y. 2011) ..............................................................................7

*In Re Duofold Inc.*,
  1974 WL 20125 (T.T.A.B. Sept. 3, 1974) ........................................................................5

*Estee Lauder Inc. v The Gap, Inc.*,
  108 F3d 1503 (2d Cir. 1997) ............................................................................................4

*Int'l Info. Sys. Sec. Certification Consortium v. Sec. Univ. LLC*,
  823 F.3d 153 (2d Cir. 2015) .............................................................................................5

*Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Print. and Pub. Co. v. Meredith Corp.*, 991 F.2d 1072 (2d Cir. 1993) ...............................................................3

*Kelly-Brown v. Winfrey*,
  717 F.3d 295 (2d Cir. 2013) .............................................................................................5

*In re MBNA Am. Bank, N.A.*,
  340 F.3d 1328 (Fed. Cir. 2003) ........................................................................................3

*N.Y. State Elec. & Gas Corp. v. U.S. Gas & Elec., Inc.*,
  697 F. Supp. 2d 415 (W.D.N.Y. 2010) ............................................................................4

*NYC Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 F. Supp. 2d 305 (S.D.N.Y. 2010) ..............................................................................7

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
  317 F.3d 209 (2d Cir. 2003) ...........................................................................................10

*Pirone v MacMillan, Inc.*,
  894 F.2d 579 (2d Cir. 1990) .............................................................................................5

*Squirrel Brand Co. v. Green Gables Inv. Co.*,
  1984 WL 62816 (T.T.A.B. 1984) .....................................................................................5

**Statutes**

15 U.S.C. § 1052(e) ...................................................................................................................4

**Other Authorities**

McCarthy on Trademarks and Unfair Competition §11:17 (5th ed.) ..............................................4

Plaintiff Daily News Charities, Inc. ("DNC" or "Plaintiff") submits this reply memorandum of law in support of its motion for preliminary injunction (the "Motion") against Defendant USA Boxing, Metropolitan Association ("Metro" or "Defendant").

## INTRODUCTION

Metro's Affirmation in Opposition to Preliminary Injunction ("Opposition" or "Opp."), much like its Opposition to the TRO in this matter ("TRO Opposition"), is filled with assertions that are entirely irrelevant or lack any documentary support.[1] Finding no success with its dubious claim that its unauthorized use of DNC's GOLDEN GLOVES mark was permissible under a purported 2009 license agreement from Golden Gloves of America ("GGA"), Metro attempts to revise history yet again to justify its infringing use – now claiming that it has *its own* 90-year history of use. However, Metro has offered no credible evidence of such continuous use and has made a public representation to the contrary. Even if Metro *could* claim use dating to the period its purported predecessor had sanctioning authority, that use – encompassing 20 years during which DNC owned a federal trademark registration – just like the use during Metro's existence, would have been under the auspices of Plaintiff.

Moreover, Metro's purported showing of harm from the relief sought by DNC is comprised of irrelevant analysis of its ability to conduct a tournament. Metro does not explain how it will be harmed by having to stop using the GOLDEN GLOVES mark before trial, particularly when it requested an extension, with the TRO in place while continuing to conduct its tournament. Nor has it in any way undermined DNC's showing of the loss of control of goodwill that would result from Metro's infringing use of its mark in connection with Metro's

---

[1] Metro's counsel's contention that the Opposition contains "factual allegations that are corrected and/or have not been previously expressed by Metro," because of Mr. Woluewich's "emergency pro bono representation," (Opp. ¶ 5), *inter aliai,* is itself disingenuous, given Mr. Woluewich has been negotiating with DNC lawyers since at least July of 2017 and was involved with this litigation at its inception. *See* Declaration of Marci E. Sweren, dated January 23, 2018 ("Second Sweren Decl.") ¶ 3, Ex. A.

2018 tournament, which establishes DNC's entitlement to preliminary relief. Accordingly, the Court should grant DNC's motion for a preliminary injunction in its entirety.

## ARGUMENT

I. **PLAINTIFF HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS**

    A. **Metro Has No Basis For Asserting Continuous Use of the Mark GOLDEN GLOVES And Even As Alleged Its Use Would Have Been Licensed Use That Does Not Trump DNC's Common Law Rights**

Despite the fact that Metro's own website directs visitors to contact the *Daily News* for history of the tournament, (Compl., Ex. D), and its prior assertion that its rights derived from an apparently non-existent license from GGA (TRO Opp. ¶ 12(f)), Metro now claims that it has continuous use dating back to a purported predecessor from the 1920s. However, Metro's attempt to overcome DNC's long-standing common law rights in the mark, which it acknowledged during the hearing on the TRO (*see* December 19, 2017 Hr'g Transcript 33:12-16, attached as Ex. A to the Declaration of Mark Lerner, dated January 23, 2018 ("Lerner Decl.")), based on naked assertions lacking documentary evidence is transparently unavailing.[2] Even if Metro could demonstrate a clear line from prior entities (which it cannot) and use dating to the earliest days of the tournament, any such use was clearly under the auspices of and as a licensee of DNC, which founded the tournament, made the original arrangements for it and was the owner of a registered trademark for twenty years before Metro was even incorporated. ECF#16, Sweren Decl. ¶ 5, Ex. E. Indeed, DNC continued to be the owner of a registered mark during more than a decade of working with Metro on the tournament, as evidenced by the parties' 1992 agreement. ECF #16-7, Sweren Decl., Ex. G. Metro has not provided any explanation for how its rights could possibly have developed separately from the rights owned by DNC. Moreover, it has

---

[2] Metro's purported prior use of the mark dubiously relies on the premise that Metropolitan Association A.A.U. is the predecessor-in-interest for Metro, for which Metro cites no evidence.

offered no evidence or details as to how or where it affixed the mark or what decisions it made in organizing, advertising and maintaining the tournament. Nor has it challenged any evidence submitted by DNC regarding its role in founding, naming and producing the tournament. Thus, it has not established any separate right that would make permissible the current unauthorized use of the mark DNC seeks to enjoin. Nor has Metro submitted evidence undercutting the strong likelihood of confusion demonstrated by DNC in its opening brief. As such, Metro's unelaborated and unsupported statements regarding prior use – that in any case could only have been under the auspices of DNC – do not in the slightest weaken DNC's likelihood of success on the merits.

### B. The Phrase GOLDEN GLOVES Is Not Descriptive

Metro further contends that a preliminary injunction is unwarranted because the GOLDEN GLOVES mark is descriptive, and thus entitled to lesser protection. This is simply incorrect.[3] A descriptive mark "is one that tells something about a product, its qualities, ingredients or characteristics." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Print. and Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993). Examples of descriptive marks include such marks as PHILADELPHIA CARD, when used to refer to credit card services for cards depicting Philadelphia targeting customers in Philadelphia, *see In re MBNA Am. Bank, N.A.*, 340 F.3d 1328, 1334 (Fed. Cir. 2003) and "PM" when used to refer to an analgesic/sleep aid designed for night-time use, *see Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992). The fact that "golden gloves" is descriptive of an award given to winning boxers does not make it descriptive of services in the nature of producing boxing

---

[3] Indeed, the Court has already concluded in the TRO opinion that the mark was "suggestive" and "therefore presumptively entitled to protection." (Temp. Restraining Order at 3 n.2).

3

2881912_8

tournaments.[4] Even if the mark had been merely descriptive, it has acquired distinctiveness through over 90 years of continuous use by DNC. *See N.Y. State Elec. & Gas Corp. v. U.S. Gas & Elec., Inc.*, 697 F. Supp. 2d 415, 429 (W.D.N.Y. 2010) (finding that name "New York State Electric and Gas" had acquired secondary meaning through more than seven decades of continuous, exclusive use). In addition, the PTO's approval of GOLDEN GLOVES for registration further establishes the mark's distinctiveness. *See* 15 U.S.C. § 1052(e) (prohibiting registration of merely descriptive marks).

Metro's resort to various examples of other tournaments with "Gloves" in the title as evidence of descriptiveness is also without merit. *See* Opp. ¶ 13. This line of argument suffers from inconsistencies and/or a lack of documentary support. For example, in its Opposition, Metro references a "Spanish Golden Gloves" as well as a "Spanish Gloves," the latter of which it also referenced at the contempt hearing (*see* December 22, 2017 Hr'g Transcript ("Contempt Hr'g Transcript") 5:14-6:8, 12:21-13:1, Lerner Decl., Ex. B), all without any documentary evidence regarding whether they are separate tournaments or if either was the actual name of a tournament. Nor are they put into any context as to the timing of the tournament(s), including whether they are ongoing or when they were last produced.

C.  **Use of GOLDEN GLOVES as a Brand Is Not "Fair Use"**

Metro appears to suggest that DNC's claim is subject to a fair use defense, but the use at issue is Metro's use of GOLDEN GLOVES as a brand for its tournament, not use of the phrase to refer to its tournament's status as a feeder into the national GGA tournament, nor a merely

---

[4] Metro's bizarre insinuation that the GOLDEN GLOVES mark is "laudatory" is similarly misplaced. In trademark law, a term that is "laudatory" "seek[s] to convey the impression that a product is excellent or of especially high quality." *Estee Lauder Inc. v The Gap, Inc.*, 108 F.3d 1503, 1509 (2d Cir. 1997). Examples include such phrases as "best," "friendly," "dependable," "preferred," "greatest," "deluxe," "supreme" and "super buy." 2 McCarthy on Trademarks and Unfair Competition §11:17 (5th ed.). GOLDEN GLOVES is clearly not a laudatory term in these circumstances because it conveys nothing about the *services* provided by DNC in connection with the tournament, let alone their *quality*, as does "Gold Medal" of flour in the example incorrectly relied upon by Metro.

4

descriptive use of the phrase in its ordinary non-trademark meaning as a reference to a golden pair of gloves. *See Kelly-Brown v.Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) ("descriptive" fair use defense requires showing, *inter alia,* that disputed use was in a descriptive sense); *see also Int'l Info. Sys. Sec. Certification Consortium v. Sec. Univ. LLC*, 823 F.3d 153, 168 (2d Cir. 2015) ("nominative fair use" involves a defendant's use of plaintiff's trademark to refer to plaintiff, and "where doing so . . . does not imply a false affiliation or endorsement by the plaintiff of the defendant.") Accordingly, Metro has no claim to a "fair use" of the GOLDEN GLOVES mark as a brand for its tournament, nor for boxers competing in its tournament, unless and until they proceed to the national tournament produced by GGA.[5]

### D. Metro's Infringing Use of a Depiction of Golden Boxing Gloves Should Not Be Permitted

Metro also gravely misses the mark in arguing that it should not be prohibited from using a depiction of gold colored boxing gloves in these circumstances on the basis that boxing gloves would not entail the same likelihood of confusion of contestant participants as use of the term GOLDEN GLOVES. Critically, Metro overlooks a bedrock proposition of trademark law that words and their pictorial representation may be treated the same in determining the likelihood of confusion between two marks. *See Pirone v MacMillan, Inc.*, 894 F.2d 579, 582 (2d Cir. 1990). Numerous tribunals have reached this conclusion in assessing word-pictorial combinations similar to those here. *See, e.g.*, *Squirrel Brand Co. v. Green Gables Inv. Co.*, 1984 WL 62816, at *2 (T.T.A.B. 1984) (SQUIRREL and picture of squirrel held equivalent for food products); *In Re Duofold Inc.*, 1974 WL 20125, at *3 (T.T.A.B. Sept. 3, 1974) (pictorial representation of golden eagle likely to cause confusion with GOLDEN EAGLE mark). Here, as the evidence

---

[5] DNC does not challenge Metro's right to make lawful use of GOLDEN GLOVES when referring to the national tournament, but it must be limited so as not to suggest that its tournament is *the* GOLDEN GLOVES tournament in the NYC Metropolitan area, or otherwise suggest an affiliation or endorsement by DNC.

submitted by DNC has shown, over its 90-year history of use, DNC has regularly used depictions of boxing gloves in connection with promotion of the tournament. *See e.g.,* ECF# 15-1, Adams Decl., Ex. A. Thus, Metro's pictorial representation of boxing gloves in the very same context will likely cause consumer confusion. Indeed, Metro's infringing uses of the mark thus far have also included a depiction of gold boxing gloves, thus amplifying the likelihood of confusion. Second Sweren Decl.¶ 9, Ex. C. Similarly, Metro's observation that trophies featuring a golden glove or gloves appear common in the NYC Metropolitan area does not undercut likelihood of confusion, as trophies, unlike trademarks, do not perform a branding function by purporting to identify the source of services. Accordingly, the Court should not permit Metro to use a depiction of golden gloves as it is confusingly similar to GOLDEN GLOVES.

> E. Metro's Use of the Phrase "Gloves" In Connection with an Amateur Boxing Tournament in the NYC Metropolitan Area Is Infringing and Should Be Enjoined Consistent with the Relief Already in Place under the TRO

While Metro apparently contends that it would be improper for the Court to grant a preliminary injunction enjoining use of the word "Gloves" in connection with the 2018 GOLDEN GLOVES tournament, such relief would merely be a continuance of the TRO the court has already issued.[6] *See* Contempt Hr'g Transcript 23:13-23:10. Given the history of this dispute, DNC's history and others' history referring to the GOLDEN GLOVES as the "Gloves," (*see* Second Sweren Decl. ¶ 8 and Ex. B), Metro's use of GOLDEN GLOVES to launch its tournament on websites featuring pictures of past GOLDEN GLOVES tournaments involving *both* Metro and DNC, and Metro's own use of the shorthand "Gloves" to refer to the Metropolitan Gloves as the tournament was briefly renamed, the continued use of "Gloves" for the 2018 tournament would be misleading. *See* Second Sweren Decl. ¶ 9, Ex. C. Indeed, Metro's

---

[6] Moreover, although Metro suggests that the injunction against the use of "gloves" is a new request, DNC has always sought to enjoin any use of the mark that is confusingly similar to GOLDEN GLOVES.

use of "Gloves" as shorthand for the tournament in encouraging contestants to "Register for the Gloves," in the tournament listing precipitating the contempt hearing is further evidence of the likelihood of confusion resulting from the use of "Gloves." *See id*. As such, the Court should grant a preliminary injunction for the same relief awarded in the Amended TRO and should not permit any "carve out" sought by Metro for "Gloves."

## II. PLAINTIFF HAS DEMONSTRATED IRREPARABLE HARM

As established in its opening brief, Plaintiff will undoubtedly suffer irreparable harm from Defendant's unauthorized use of Plaintiff's GOLDEN GLOVES mark by impairing Plaintiff's ability to control its mark and trading on the reputation and goodwill assiduously cultivated by DNC over its 90 years of continuous use of the mark. Once again, Metro does not even purport to challenge that Plaintiff will suffer irreparable harm.

## III. THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FACTORS TIP IN PLAINTIFF'S FAVOR

The caselaw is overwhelming that the equities favor the party whose mark is being infringed where the alleged infringer provides no or minimal evidence of actual harm if the injunction is issued. *See, e.g.*, *NYC Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 326 (S.D.N.Y. 2010) (balance of hardships tipped against infringing party where infringing party had not been in market long enough to develop a reputation or significant presence and failed to submit evidentiary support for other alleged harms); *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 157 (E.D.N.Y. 2011) (balance of hardships tipped in plaintiff's favor where plaintiff faced loss of reputation, goodwill and sales and harm to defendant was "mitigated by the fact that defendants can continue to market their non-infringing products" under a non-infringing mark or name). As set forth in Plaintiff's opening brief, the balance of hardships and public interest factors decidedly tip in Plaintiff's favor. Put simply, Metro has completely failed

7

to demonstrate any hardship at all (monetary or otherwise) it would suffer if it were constrained from using the GOLDEN GLOVES mark.

Metro cannot seriously claim the prohibition on the use of GOLDEN GLOVES, or even the phrase "Gloves" works any injury to Metro with respect to the 2018 GOLDEN GLOVES tournament, as Metro itself requested adjournment of the briefing on the preliminary injunction motion, during which time it was not to use GOLDEN GLOVES or "Gloves" in the title of its tournament as per the TRO. (Contempt Hr'g Transcript at 16:11-13; 22:13-16).

Although Metro attempts to manufacture "harm" by portraying DNC as motivated in this litigation by a purported desire to interfere with Metro's efforts to produce a boxing tournament and serve the community, (*see* Opp. ¶¶ 37-44), such aspersions are irrelevant to the harm analysis, and in any case, false.[7] Contrary to Metro's suggestion, DNC's purpose in filing this action is to protect its valuable intellectual property and protect the goodwill established though 90 years of use of the GOLDEN GLOVES mark and to preserve its ability to use and exploit the mark for its own future tournaments. *See* Second Sweren Decl. ¶ 6.  Moreover, in touting its "charitable" nature and intentions to serve the community by putting on a boxing tournament, Metro critically misses (or simply ignores) that DNC does not seek *to prevent* it from holding a tournament, only *infringing* DNC's mark in the process. Because DNC has no control over Metro, if Metro is permitted to continue infringing DNC's mark, DNC will continue to lose goodwill in the mark. Nowhere in its Opposition does Metro actually dispute this central fact, nor cite any authority indicating that the balance of hardships would favor an infringing party in these circumstances, particularly when it has not – and cannot – allege any resources expended in developing the good will of the mark.

---

[7] DNC was compelled to file this action after efforts at cooperation failed and Metro as a sanctioning body and a gatekeeper for tournaments, used its position and tried to hijack the tournament from DNC by demanding that it accept a role merely as a "title sponsor." *See* Second Sweren Decl. ¶¶ 5-6.

To the extent Metro's argument could be read to claim that the public interest factor favors Metro in alleging that competing boxers will be harmed, that argument also widely misses the mark, as the relief sought only enjoins Metro from using an infringing mark not from holding a boxing tournament in which boxers can participate and by which they can qualify for the national GOLDEN GLOVES tournament. As such, Metro's misplaced attempts to focus the Court on the alleged harm to boxing tournament participants fundamentally misconstrues the relief sought on this motion, and does not tip the balance of hardships in its favor.

**IV.   THE SCOPE OF THE INJUNCTIVE RELIEF SOUGHT BY DNC IS PROPER**

DNC does not disagree with Metro that injunctive relief should be "narrowly tailored to fit specific legal violations" and "should not impose unnecessary burdens on lawful activity." *Beastie Boys v. Monster Energy Co.*, 87 F. Supp. 3d 672, 680 (S.D.N.Y. 2015). Unlike in the *Beastie Boys* case relied on by Metro, the relief sought by DNC in no way impermissibly "sweep[s] well beyond" the subject of the litigation – Metro's infringing use of the mark in connection with the GOLDEN GLOVES tournament – or encompasses lawful uses of the term "Golden Gloves." *Beastie Boys*, 87 F. Supp. 3d at 680. The relief requested by DNC, and currently in place through the Court's Amended TRO,[8] permits Metro to use the term Golden Gloves to the extent necessary to inform potential participants that winners of the tournament being run by Metro will be eligible to compete in the national GOLDEN GLOVES tournament and that it is not affiliated with the boxing tournament put on by DNC or its affiliates. (Amend. TRO ¶ 3). As such, despite Metro's vague protestations to the contrary, the relief sought is appropriately tailored to the core conduct at issue in this litigation. Metro's citation to *Patsy's* –

---

[8] On December 20, 2017, the Court entered a temporary restraining order in this matter, enjoining Metro from, among other things, using the GOLDEN GLOVES mark or any confusingly similar mark in connection with an amateur boxing competition in the NYC Metropolitan area. (ECF # 25, Temp. Restraining Order at 7-8). On December 22, 2017, the Court amended the temporary restraining order to explicitly prohibit Metro's use of the term "Gloves" subject to certain exceptions. (ECF # 34, Amend. Temp. Restraining Order at 2).

without explanation – is similarly inapposite. DNC has not asked for an injunction so broad as to potentially restrict lawful use of the mark in an area outside of the subject of the litigation. *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir. 2003) (injunction restricting senior user's identification of its restaurant business was improper when subject of suit was pasta sauce and packaged food products and not the restaurant business). As DNC has made patently clear, DNC only seeks to restrict use of its mark in connection with the GOLDEN GLOVES tournament in the NYC Metropolitan area. No other relief is at issue, and as such, Metro's hand-wringing about the scope of the injunction is misplaced.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's motion for a preliminary injunction in its entirety.

Dated: January 23, 2018
New York, New York

SATTERLEE STEPHENS LLP

By: _____
Mark Lerner
230 Park Avenue
Suite 1130
New York, NY 10169
Tel: (212) 404-8714

*Attorneys for Plaintiff,
Daily News Charities, Inc.*